UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ROGER BAILEY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:15CV00844 AGF |
| | ) | |
| MONSANTO COMPANY; SOLUTIA, | ) | |
| INC.; PHARMACIA CORP.; and PFIZER, | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This products liability action is before the Court on Plaintiffs' two motions (Doc. Nos. 24 & 39) to remand the case to state court. Twelve individual Plaintiffs seek to hold four inter-related corporations liable, under Missouri tort law, for the manufacture and sale of polychlorinated biphenyls ("PCBs"), environmental and dietary exposure to which Plaintiffs allege caused them to contract non-Hodgkin's lymphoma. The case was filed in Missouri state court and removed to this Court based on diversity jurisdiction, 28 U.S.C. § 1332(a), and federal officer removal, 28 U.S.C. § 1442(a)(1).

One motion to remand presents the question of whether the two forum Defendants – Monsanto Co. ("New Monsanto") and Solutia, Inc. ("Solutia") – simply indemnified, rather than assumed the liabilities of, a third Defendant – Pharmacia, LLC[1] ("Pharmacia")

---

[1] This Defendant is named as Pharmacia Corp. in the complaint (petition); however, as of November 30, 2012, the entity converted to an LLC.

– for claims arising out of the manufacture of PCBs, such that both of the forum Defendants were fraudulently joined to defeat diversity jurisdiction. The other motion to remand presents the question of whether federal officer removal is proper here. On November 24, 2015, oral argument was held on the motions to remand, and the parties thereafter filed motions for leave to supplement the record. The motions for leave will be granted, and for the reasons set forth below, both motions to remand will be granted.

## BACKGROUND

Plaintiffs all reside in states other than Missouri. They initiated this action in Missouri state court on May 22, 2015, against New Monsanto, Solutia, Pharmacia, and Pfizer, Inc. It is undisputed that there is complete diversity of citizenship. It is also undisputed that New Monsanto and Solutia have their principal places of business in Missouri, and are thus Missouri residents for purposes of diversity jurisdiction, whereas Pharmacia and Pfizer are not residents of Missouri. The complaint alleges that Plaintiffs contracted non-Hodgkin's lymphoma as a result of their dietary and environmental exposure to PCBs manufactured by the chemical division of "Old Monsanto," a company that, as of 2000, ceased to exist. It is also undisputed that Pharmacia, which was formerly "Old Monsanto," is a proper Defendant in this action.

For purposes of the motions now before the Court, the record establishes the following. From the early 1930s[2] until 1977, Old Monsanto (and its predecessor in interest) was virtually the sole manufacturer of the PCBs used in the United States. PCBs

---

[2] Various years appear in the record as the start date of Old Monsanto's manufacture of PCBs. The exact year is not relevant.

are a group of man-made chemicals that have been used in many different products, including electrical equipment to prevent fires and explosions.  By the late 1930s it was known that PCBs were systemically toxic to humans, and by the late 1960s that PCBs were accumulating in the environment and food chain.  In the early 1970s, Old Monsanto ceased manufacturing PCBs in "open systems," and limited their manufacture to "closed systems."  In August 1977, Old Monsanto stopped all manufacture of PCBs.  The Toxic Substance Control Act of 1976 ("TCSA") allowed the manufacture of PCBs until 1979 and banned it thereafter.

In 1997, Old Monsanto's chemical business was spun off into a new independent company, Solutia, pursuant to a "Distribution Agreement" (Doc. No. 34-10 at 5-53). Under the Distribution Agreement, Solutia expressly assumed and agreed to indemnify Old Monsanto for liabilities related to Old Monsanto's chemical business, including its manufacture of PCBs.[3]  The Distribution Agreement included a provision, § 10.07, that there were no third-party beneficiaries thereto, as follows:

> Except for the provisions of sections 3.03 and 3.04 relating to Indemnities, which are also for the benefit of the Indemnitees, this Agreement is solely for the benefit of the parties hereto and . . .  and is not intended to confer upon any other Persons any rights or remedies hereunder.

*Id*. at 52.

On March 31, 2000, the remaining divisions of Old Monsanto (agricultural and pharmaceutical) merged with Pharmacia & Upjohn, Inc., with Old Monsanto being the

---

[3]    The relevant section of the Distribution Agreement, § 4.03(b), stated that Solutia "shall retain or assume, as the case may be, and shall indemnify and hold harmless [Old Monsanto] from and against (1) all Chemicals Liabilities . . . ."  (Doc. No. 34-10 at 25.)

surviving corporation and taking the Pharmacia name.  Pharmacia then transferred its

agricultural business to a newly created subsidiary, New Monsanto, which it spun off by

means of a "Separation Agreement" dated September 1, 2000 (Doc. No. 34-10 at 55-

148), and amended on July 1, 2002 (Doc. No. 73-2).  Under the Separation Agreement,

Pharmacia contributed and transferred to New Monsanto, and New Monsanto "received

and assumed, directly or indirectly, certain assets and liabilities."  (Doc. No. 34-10 at 59.)

More specifically, under § 2.01 of the Separation Agreement, Pharmacia was to

transfer to New Monsanto all of Pharmacia's interests in the New Monsanto assets, and

New Monsanto was "to assume all the [New] Monsanto Liabilities," with "[New]

Monsanto Liabilities" defined in the definitional section (Article I) as including all

liabilities of either New Monsanto or Pharmacia "that were assumed by Solutia . . . in

connection with the spinoff of Solutia . . . to the extent that Solutia fails to pay, perform

or discharge such Liabilities . . . ." *Id*. at 74, 71.  The Separation Agreement contained

the same no-third-party-beneficiaries language as the Distribution Agreement.  *Id*. at 97.

In a July 1, 2002 amendment to the Distribution Agreement, Pharmacia and New

Monsanto described the 2000 Separation Agreement as having the following effect:

> Pharmacia assigned and transferred certain assets related to its chemicals
> and agricultural businesses and certain other assets to New Monsanto and
> New Monsanto assumed certain liabilities relating thereto *and* all liabilities
> that were assumed by Solutia or any of its subsidiaries in connection with
> the Solutia Distribution to the extent that Solutia fails to pay, perform or
> discharge such liabilities.

(Doc. No. 73-1at 3) (emphasis added).

In 2003, Pharmacia merged with Pfizer. Thereafter, on December 17, 2003, Solutia filed a petition for Chapter 11 bankruptcy in the Bankruptcy Court for the Southern District of New York. In Solutia's June 29, 2007 memorandum to the bankruptcy court in support of approval of a Settlement Agreement reached between Solutia and New Monsanto that was to be part of Solutia's Reorganization Plan, Solutia explained that at the time of Solutia's spin-off, it was believed that PCB tort lawsuits against Old Monsanto were "manageable." But since that time, PCB litigation had become unmanageable, and the Settlement Agreement "would allow Solutia to accomplish its primary goal since it filed for chapter 11: to reallocate the majority of the legacy liabilities." (Doc. No. 25-1 at 5-6.) Solutia continued that under the Settlement Agreement, New Monsanto had "agreed to be responsible for all past and future claims related to conduct that occurred before the spin-off . . . [including PCB claims] (the 'Legacy Tort Claims'.)" *Id*. at 6. And in a supplemental memorandum, Solutia represented several times that pursuant to the Settlement Agreement, New Monsanto would be "financially responsible for all Legacy Tort Claims." (Doc. No. 25-2 at 3, 4.)

The "Recitals" section of Settlement Agreement (Doc. No. 34-10 at 150-200)[4] includes the following statements:

> WHEREAS, in connection with the Settlement, [New] Monsanto will
> receive, as set forth in the [Reorganization] Plan, up to . . . $175 million . . .

---

[4]   Defendants have submitted to the Court, as an exhibit to their reply addressing the first motion to remand, a copy of an unexecuted version of the Settlement Agreement dated October 15, 2007. After oral argument, they submitted a copy of an executed "Amended and Restated Settlement Agreement" dated February 28, 2008. The relevant provisions are identical in both versions. The Court will cite to the October 15, 2007 version which appears in the record as part of Doc. No. 34-10.

for, among other things, [New] Monsanto's agreement to be financially
responsible for (i) the Legacy Tort Claims. . . .

WHEREAS, in accordance with the [Reorganization] Plan and the terms of
this Agreement, the Distribution Agreement . . . is superseded [by the
Settlement Agreement] and, on the Effective Date [of the Settlement
Agreement], of no further force and effect.

*Id*. at 157.

The Settlement Agreement set out indemnification obligations of Solutia (§ 5.01)

and of New Monsanto (§ 5.02).  Section 5.01 provided that "Solutia shall indemnify

[New] Monsanto  . . .  and Pharmacia  . . . for any liability arising out of . . . the Chemical

Liabilities, [except] to the extent that . . . [New] Monsanto agreed to indemnify Solutia

. . .  for such Loses pursuant to Section 5.02 . . . ."  *Id*. at 179-80.  Section 5.02 provided

that "[New] Monsanto shall indemnify Solutia . . .  for any Losses which [Solutia] . . .

becomes subject to, as a result or arising out of . . . any Legacy Tort Claims."  *Id*. at 180.

Although the Settlement Agreement was between Solutia and New Monsanto, it

attached and adopted therein the "Pharmacia Indemnity Agreement" between Solutia and

Pharmacia.  Thus the Settlement Agreement establishes rights and obligations among all

three parties.  In the Pharmacia Indemnity Agreement, Solutia agreed to "indemnify

Pharmacia" for "any Loss" arising from, among other things, "Solutia Tort Claims" and

"Chemical Liabilities [with certain exceptions]."   (Doc. No. 73-3 at 2-3.)

On November 29, 2007, the bankruptcy court confirmed Solutia's Reorganization

Plan and approved and attached thereto the Settlement Agreement between Solutia and

New Monsanto.  (Doc. No. 34-11 at 1-67.)  The Confirmation Order included an

injunction against persons enforcing claims against Solutia and an injunction against

6

persons enforcing claims against New Monsanto and Pharmacia. Each of the two injunctions provided, however, that it "shall not prevent the Holders of Tort Claims . . . from exercising their rights against" Solutia, and Monsanto and Pharmacia, respectively. *Id.* at 41, 43-44.

The Reorganization Plan (Doc. No. 34-11 at 69-157) stated, as did the Settlement Agreement, that the Distribution Agreement "shall not survive the Chapter 11 Case[]." (Doc. No. 34-11 at 111.) The Reorganization Plan also stated as follows in a section dealing with the treatment of tort claims:

> The Tort Claims shall be unaffected by the Chapter 11 Cases, this Plan or the Plan Documents. After the Effective Date, the Tort Claims shall be resolved pursuant to applicable law and in the ordinary course of business. Payment of the Tort Claims, in accordance with the [New] Monsanto Tort Management, will be allocated between Reorganized Solutia and [New] Monsanto pursuant to the terms of the [New] Monsanto Settlement Agreement, provided, however, that such allocations are solely as between Solutia and [New] Monsanto and nothing in the Monsanto Settlement Agreement shall impair or adversely affect the Tort Claims. For the sake of clarity, pursuant to the [New] Monsanto Settlement Agreement, [New] Monsanto shall take financial responsibility, as between itself and Reorganized Solutia only, for the management and payment of the Legacy Tort Claims, including all costs related to the defense, mediation, arbitration, settlement, and any judgment with respect to the Legacy Tort Claims and Reorganized Solutia shall be financially responsible for the Solutia Tort Claims [defined as "all Tort Claims other than Legacy Tort Claims"] if any.

*Id*. at 105.

Later, in a section entitled "Releases by Holders of Claims and Equity Interests," the Plan stated that "the Holders of Tort Claims shall not be deemed to release [Solutia] . . . on account of any liability arising from or related to the Tort Claims and . . . the Holders of Tort Claims . . . as a result of the [New] Monsanto Settlement Agreement,

shall not be deemed to release [New] Monsanto or Pharmacia . . . on account of any liability from or related to the Tort Claims." *Id*. at 139. The Reorganization Plan defined "Legacy Tort Claims" to include all claims arising under tort law, whether currently asserted or asserted in the future,

> (a) which constitute Chemicals Liabilities assumed by Solutia under the Distribution Agreement;
>
> (b) for which Solutia was required to indemnify Monsanto and Pharmacia under the Distribution Agreement; and
>
> (c) which are for . . . personal injury [or] products liability . . . arising out of or related to exposure to . . . PCB.

*Id*. at 88. "Tort Claims" were defined as:

> "all Claims, whether currently asserted or asserted in the future, . . . arising under tort law for personal injury . . . arising from exposure to chemicals . . . regardless of whether: (a) [Solutia] is, was or will be named as a defendant in any action commenced by or on behalf of the holder of such Tort Claim; (b) such holder has filed a proof of claim in the Chapter 11 Case; or (c) the alleged exposure occurred before or after the [Solutia] Spinoff.

*Id*. at 96.

Plaintiffs assert in the complaint that as a result of these various transactions, all four Defendants "collectively have legal responsibility" for Old Monsanto's production of PCBs. (Doc. No. 5 at 5-6.) Plaintiffs assert two state law claims: strict liability for design defect, and negligence. The complaint states that the case was not removable under the forum-defendant rule of 28 U.S.C. § 1441(b)(2), due to the presence of at least one Missouri Defendant. Plaintiffs also state that they "affirmatively disclaim" any damages or action arising out of an act of the United States or of any federal officer.

On May 28, 2015, six days after the action was filed in state court, and before *any* Defendants had been served, New Monsanto and Solutia removed the case to this Court pursuant to federal diversity jurisdiction under 28 U.S.C. § 1332(a).  The removing Defendants contended that although they were forum Defendants, and §1442(b)(2) precludes removal if any party "properly joined and served"[5] is a forum defendant, removal here was nonetheless proper because (1) removal was accomplished before the forum Defendants were served,[6] and (2) the forum Defendants were fraudulently joined, as neither company ever manufactured or sold PCBs.  The moving Defendants contended that while they indemnified Pharmacia for tort liabilities arising out of the manufacture and sale of PCBs, they did not assume liability for these activities; thus, pursuant to Missouri law, which does not allow a direct suit against an indemnitor, Plaintiffs have no direct cause of action against New Monsanto and Solutia.

On May 29, 2015, Pfizer and Pharmacia filed their consent to removal.  In its answer filed on June 4, 2015, Pharmacia asserted 34 affirmative defenses, the 33rd of which was that Plaintiffs' action was preempted by the TSCA and the Federal Food, Drug, and Cosmetic Act ("FFDCA").  (Doc. No. 16 at 11-20).  On June 19, 2015, Pharmacia filed a notice of additional grounds supporting removal (Doc. No. 22), in which it argued that removal was also proper under the federal officer removal statute, 28

---

[5]   Section 1441(b)(2) provides as follows:  "A civil action otherwise removable solely on the basis of [diversity] may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which the action is brought."

[6]   New Monsanto and Solutia stated that they obtained a copy of the complaint from the state court's electronic file.  (Doc. No. 1 at 2.)

U.S.C. §1442(a)(1),[7] because the production of PCBs was done "at the request and under the direction of" the federal government, and because Pharmacia asserted a colorable federal defense: that Plaintiffs' claims were preempted by the TSCA.

Pharmacia bases its federal officer removal on the following facts (as presented in its notice of additional grounds supporting removal): In 1971, the federal government convened an Interdepartmental Task Force on PCBs to "coordinate the scientific efforts of the Government aimed at understanding [PCBs], and to strengthen the Government's ability to protect the public from actual or potential hazards from PCBs." (Doc. No. 22-2 at 4). In a 1972 report, the Task Force concluded that:

> The use of PCBs should not be banned entirely. Their continued use for transformers and capacitors in the near future is considered necessary because of the significantly increased risk of fire and explosion and the disruption of electrical service which would result from a ban on PCB use.

*Id.* at 7.

In February 1972, OSHA adopted electrical standards that required the use of PCBs in a number of applications. In 1976, Congress passed the TSCA, and delegated to the EPA the power to regulate a wide range of chemicals in the United States, specifically including PCBs. 15 U.S.C. § 2601-2629. Recognizing that the continued use of PCBs remained necessary in certain applications, Congress specifically authorized their continued manufacture until January 1979. *Id.* at §2605(e)(3)(A)(i). The FDA regulates

---

[7]    Section 1442(a)(1) allows the removal of cases directed against "any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office . . . ."

acceptable levels of PCBs in food under the FFDCA, and established tolerance levels allowing low levels of PCBs to occur in a wide range of foods.

According to Pharmacia, for many years it (Old Monsanto) "manufactured PCBs directly for agencies of the federal government, under contracts that specifically required the manufacture of PCBs." Pharmacia gives one example of having been a federal contractor: "For example, in the 1970s, Pharmacia produced heat transfer fluids containing PCBs for the U.S. Atomic Energy Commission." (Doc. No. 22 at 7). Pharmacia submits an exhibit dated March 28, 1972, showing an intended future sale of 400 barrels of PCBs to the Atomic Energy Commission (and Bendix Corp. as a joint buyer). (Doc. No. 22-5). Pharmacia asserted that it also manufactured PCBs for federal defense contractors, "under contracts specifically requiring PCBs, at the direction of the federal government." (Doc. No. 22 at 8.) As an example, Pharmacia submits evidence that "[b]y the mid-1970s, the Tennessee Valley Authority had over a million gallons of PCB-containing fluids in use on the TVA system." *Id*. at 11.

## ARGUMENTS OF THE PARTIES

### Diversity Jurisdiction

On June 26, 2015, Plaintiffs filed their first motion to remand, challenging Defendants' assertion of diversity jurisdiction. Plaintiffs argue that removal on the basis of diversity is barred by the forum-defendant rule for two reasons.[8] First, while recognizing some contrary authority, Plaintiffs cite numerous cases that hold that a

---

[8]    A third reason – that the Notice of Removal did not identify the citizenship of the members of Pharmacia – is now moot in light of New Monsanto and Solutia's filing that does so (Doc. No. 32), and that establishes that there is complete diversity in this case.

defendant should not be permitted to avoid the forum-defendant rule by removing a case before any forum defendants were "properly . . . served," by "hawking" the state court docket, as that would violate the intent of the rule. Second, Plaintiffs argue that the forum Defendants (New Monsanto and Solutia) were not fraudulently joined, and Defendants have made no factual showing that one or both of them cannot be held liable for Old Monsanto's manufacture of PCBs, a determination which cannot be made at this early stage of the proceedings.

Plaintiffs assert that they "are in the process of investigating the historic responsibility for PCB liabilities on the part of the various defendants in this case," and need to engage in further discovery on the matter. (Doc. No. 25 at 11.) But they point to some evidence they now have in support of their position, namely Solutia's memorandum and supplemental memorandum filed in the bankruptcy court in support of Solutia's motion for approval of the Settlement Agreement with New Monsanto, which Plaintiffs maintain show that as part of Solutia's reorganization, certain liabilities it had assumed in its spinoff from Old Monsanto were assumed (not merely indemnified) by New Monsanto, including liability for PCB tort claims such as Plaintiffs'.

On July 20, 2015, all Defendants filed a joint response (Doc. No. 34) to Plaintiffs' first motion to remand. Defendants first argue that Plaintiffs' claims are legally and factually frivolous, legally frivolous because they are based on the faulty premise that Old Monsanto owed a duty to everyone in the nation not to manufacture PCBs, and factually frivolous because there is no scientific basis for finding causation between PCBs and Plaintiffs' cancer. Turning to the question of the Court's subject matter

jurisdiction, Defendants first question the continued viability of the principle that "any doubt" should be resolved in favor of remand. They also question the applicability of the forum-defendant rule itself in a case such as this in which the rationales for the rule, according to Defendants, do not fit, and where removal is not based "solely" on diversity (i.e., removal is also based on federal officer removal).

Defendants continue to maintain that, in any event, the forum-defendant rule does not bar removal here because the forum-Defendants were not served prior to removal, and because New Monsanto and Solutia were fraudulently joined as they are mere indemnitors with respect to Plaintiffs' claims and thus, under Missouri law, cannot be held directly liable. The gravamen of Defendants' fraudulent-joinder argument is that the Settlement Agreement superseded whatever obligations Solutia or New Monsanto undertook in the Distribution Agreement and the Separation Agreement, and replaced those older obligations with the obligation to indemnify only. Defendants also argue that the no-third-party-beneficiaries provisions in the Distribution Agreement and the Separation Agreement preclude Plaintiffs' claims against Monsanto and Solutia. According to Defendants, even if Solutia or Monsanto agreed to assume Old Monsanto/Pharmacia's liabilities, only Pharmacia has the legal right to enforce that obligation; Plaintiffs do not.

In their reply (Doc. No. 50) addressing diversity jurisdiction, Plaintiffs re-argue their points previously raised, stressing that the Settlement Agreement did not "take the liabilities out of Solutia and/or Monsanto, where they resided, and put them back into Pharmacia." Plaintiffs bring to the Court's attention a recent case that held that Solutia

13

could be held liable for Old Monsanto's PCB liabilities, based on an analysis of the documents described above: *Town of Lexington v. Pharmacia Corp*., No. 12-CV-11645, 2015 WL 1321457, at *7 (D. Mass. Mar. 24, 2015).

The plaintiff in *Town of Lexington* was a town that sought recovery for environmental remediation of property damage due to the presence of PCBs in the air of one of its school buildings. The plaintiff asserted state tort claims and named as defendants Pharmacia, Solutia, and New Monsanto. The district court denied Solutia's motion for summary judgment that was based on virtually the same arguments Solutia raises here. The court concluded that the liability assumed by Solutia in the Distribution Agreement was unaltered by Solutia's Reorganization Plan, which preserved the rights of "Holders of Tort Claims." Thus, according to the court, "although the Distribution Agreement was superseded by the Plan Documents, including the Settlement Agreement, Solutia retained the liability it assumed by virtue of the Distribution Agreement . . . . Solutia assumed direct liability and, therefore, [Plaintiff] may assert its [PCB] claims directly against Solutia." *Id*. at *6. The court also held that Solutia could not shield itself from liability it expressly assumed by virtue of the clause negating third-party beneficiary rights. *Id*. at *5.

With respect to New Monsanto, the *Town of Lexington* court held that the matter was not that clear ("The intent of the parties is difficult to discern from the various agreements apportioning liability among the three defendants [New Monsanto, Solutia, and Pharmacia].") , *id*. at *8, and invited further briefing on the matter.

Plaintiffs here attach to their reply a 2015 Form 10-K that New Monsanto submitted to the Securities and Exchange Commission, in which New Monsanto stated that it was involved in legal proceedings "to which our former parent Pharmacia LLC and its former subsidiary Solutia Inc. is a party but that we manage and for which we are also responsible." (Doc. No. 50-8 at 4.) In the same form, New Monsanto included in its liabilities "tort litigation related to" Pharmacia's former chemical business, specifically noting PCBs. *Id*. at 5. As Plaintiffs acknowledge, elsewhere in the Form 10-K New Monsanto characterizes its litigation liability in these cases as arising "in the ordinary course of its business or pursuant to [New] Monsanto's indemnification obligations to Pharmacia." *Id*. at 7. In Plaintiff's view, such conflicting language shows that Defendants have not met their burden of presenting clear and convincing evidence that Plaintiffs do not have a colorable claim against New Monsanto.

**Federal Officer Removal**

On July 23, 2015, Plaintiffs filed a second motion to remand, this motion addressing the issue of federal officer removal. Plaintiffs argue that Old Monsanto was not "acting under" a federal officer within the meaning of § 1442(a)(1) when it manufactured PCBs, and there is no causal connection between Old Monsanto's actions and official authority, as required for federal officer removal. According to Plaintiffs, the PCBs Monsanto manufactured for the government were for use in "closed electrical settings," whereas Plaintiffs' claims "attack [Old] Monsanto's supply of PCBs for use in non-closed applications, prior to the interval in which [Old Monsanto] says it was

required [by the government] to continue selling [PCBs] for use in closed applications."
(Doc. No. 40 at 4.)

Plaintiffs also argue that Old Monsanto lacks a colorable federal defense (another requirement for federal officer removal) based on TSCA preemption, as evidenced by the fact that such a defense has never been raised – much less successfully – in the years of PCB litigation against Old Monsanto. According to Plaintiffs, the defense is especially unavailable here as the TSCA became effective in 1977, and Plaintiffs are challenging conduct that occurred before its enactment. Plaintiffs also point to "the savings clause" in the TSCA that Plaintiffs argue preserves state tort claims seeking damages.

In response to Plaintiffs' second motion to remand, Pharmacia states that for federal officer removal, a liberal standard for removal applies. Pharmacia relies on the facts that from 1929 to 1977, Old Monsanto manufactured PCBs directly for use by the federal government, an executive branch task force determined their use was "necessary" to maintain the safety of the nation's power grid, federal OSHA regulations required their use, and Congress passed legislation expressly permitting their manufacture through 1979. Pharmacia argues that as a result, Plaintiffs' claims challenge Old Monsanto's conduct performed under color of federal office. Pharmacia notes that the complaint is based on the manufacture of all PCBs by Old Monsanto, and it is not possible to determine to which PCBs Plaintiffs were exposed. In addition, according to Pharmacia, courts routinely deny requests for remand based on "generic disclaimers" like that in Plaintiff's complaint.

In their reply addressing federal officer removal, Plaintiffs maintain that the federal removal statute is not read liberally where only the liability of a private company purportedly acting at the direction of a federal officer is at issue. Plaintiffs argue that "[t]he vast, overwhelming majority of [Old Monsanto's] products were sold to private companies" not the government. . . . [and] simply because a vanishingly small number of PCB sales were made to government purchasers" does not make the case removable on federal officer grounds. (Doc. No. 52 at 4-5.)

Plaintiffs provide excerpts from the report of one if their experts on the total quantity of PCBs sold for domestic use, which estimates that over the years, a total of 1.2 billion pounds of PCB were sold. (Doc. No. 52-1 at 4.) Plaintiffs argue that Defendants had provided evidence that only 47,000 pounds of PCBs were sold to the government, or, in other words, that "slightly more than one one hundredth of one percent of all of [Old] Monsanto's PCB sales were made to the government." (Doc. No. 52 at 6.) At the hearing, Plaintiffs characterized this argument as a "*de minimis*" argument, acknowledging that due to the unique theory of liability in this case, they do not have case law supporting their position. While Defendants sought to debunk the *de minimis* argument, they did not challenge the one one hundredth of one percent figure presented by Plaintiffs.

## Surreply and Surresponse

In a surreply directed to both motions to remand, Defendants argue that the liberal standard favoring federal officer removal applies even when the removing party is a private company. According to Defendants, the volume of PCBs manufactured for direct

sale to the government is irrelevant because the complaint challenges the manufacture of all PCBs. Cases alleging improper disposal of PCBs that rejected federal officer removal are not instructive, according to Defendants, because the government did not tell the private companies in those cases how to dispose of the PCBs, but OSHA did "require the use of PCBs in certain applications (and, thus, their manufacture)."

On the question of diversity jurisdiction, Defendants continue to argue that New Monsanto and Solutia were fraudulently joined. They again stress that the 2007 Settlement Agreement in Solutia's bankruptcy case superseded any assumption of liabilities in the Distribution Agreement or the Separation Agreement, and replaced any previous assumption of liability with indemnification obligations. Further, "[t]he specific terms of the Settlement Agreement – limiting New Monsanto's obligations to those of indemnity – control over more general provisions in the Bankruptcy Plan." According to Defendants, *Town of Lexington* was wrongly decided. (Doc. No. 55 at 6.)

Last in the volley of briefs is Plaintiffs' surresponse in which they argue that *Town of Lexington* was correctly decided, and point the Court to a recent case from the Eighth Circuit, *Hubbard v. Federated Mutual Insurance Co.*, 799 F.3d 1224, 1227 (8th Cir. Sept. 8, 2015), in which the Eighth Circuit reaffirmed the rule that "[a]ll doubts about federal jurisdiction [based on diversity of citizenship] should be resolved in favor of remand to state court."

**Supplemental Facts and Arguments re Federal Officer Removal**

On January 28, 2016, Defendants moved to supplement the factual record with respect to their assertion that removal is proper under the federal officer removal statute.

Defendants explain that they uncovered this evidence only recently with the assistance of a historical research firm and their own search of their historical records and files undertaken in connection with a subsequent case[9] raising the same claims and jurisdictional issues as the present case. The proposed "newly-discovered" evidence (Doc. No. 75-1 to 75-5) consists of documents from 1941-1942 and from 1972.

The documents from 1941-1942 consist of three requests for issuance of a Necessity Certificate made to the Secretary of War and The Advisory Commission of National Defense between May 21 and November 27, 1941, and granted between August 6, 1941 and March 13, 1942. Each of these three requests was for government funding for new facilities to increase production of PCBs. The first application states that the new facility would increase PCB production from 720,000 to 1,200,000 pounds per month and that 100% of the "increase in productive capacity [would] be directly or indirectly absorbed in the Defense Program." (Doc. No. 75-1 at 5.) The application also states that Old Monsanto had no contract with the government or its agencies for supply of diphenyl, but that there was "no doubt that a substantial part of Firestone's rubber products are today being required for defense purposes," and that four named electric companies use the product for transformers, condensers, and similar products. *Id.* at 4. The Office of Production Management recommended 100% certification, noting that PCBs were essential in the insulation of Navy cable and that there was a demand for this product to fill government orders which was "greater than can be supplied with present production facilities." *Id.* at 10, 14-15. The second request for additional funding again

---

[9]    *Kelly v. Monsanto*, 4:15CV01825 JMB.

states that 100% of the increased production would be "directly or indirectly absorbed in the Defense program." (Doc. No. 75-2 at 5.) The Office of Production Management recommended that the Certificate of Necessity be granted 100%, noting that the project would increase the annual production of PCBs by 7,200,000 pounds annually and was "necessary in the interest of national defense during this emergency period…." *Id*. at 23. The application also stated that Old Monsanto did not expect to furnish any of this material to the Army or Navy. *Id.* at 3.

A third request for funds was for new facilities that were expected to increase Old Monsanto's PCB production by an additional 130,000 pounds per month. (Doc. No. 75-3 at 4.) This document stated that demand upon manufacturers of transformers and condensers "has increased to large proportions on account of the defense program, and consequently a serious shortage of [PCPs] is now faced." *Id*. at 6. Once again, 100% of the "increase in productive capacity [would] be directly or indirectly absorbed in the Defense Program." This document also stated that Old Monsanto has not entered into any supply contract with the United States for the product nor is any such contract now anticipated." *Id*. at 3.

The proposed new evidence also shows that in 1972, the federal government directed Old Monsanto, pursuant to the Defense Production Act of 1950, to sell 3,000 pounds of PCBs to one military contractor, and in 1974 to sell three 55 gallon drums to another military contractor. The directives were issued despite Old Monsanto's objection to fill these military contractors' orders because of the environmental problems of PCBs in "open systems."

Defendants maintain that this new evidence is "directly relevant to Defendants' right to litigate cases challenging [the] manufacture of PCBs in a federal forum – an issue of first impression . . . ." (Doc. No. 75 at 6.)  Plaintiffs respond that the motion for leave to supplement is untimely, and, in any event, the new evidence does not support federal officer removal because (1) federal officer jurisdiction is unavailable to entities that simply subcontracted with other companies that were themselves contracting with the government, and (2) sales of PCBs for ultimate use by the government, even with the new sales in 1941-42 and 1971, "do not change the ultimate calculus" and were still "a vanishingly small part" of Old Monsanto's overall sales of PCBs, and thus those "*de minimis*" sales cannot give rise to federal officer jurisdiction.  (Doc. No. 79 at 3.)

In their reply, Defendants do not refute Plaintiffs' renewed "*de minimis*" assertions.  Rather, they argue that the new documents "showing that the federal government funded the expansion of Pharmacia's production of PCBs and ordered Pharmacia to sell PCBs to government contractors are relevant to show that Pharmacia 'acted under' color of federal office in manufacturing PCBs."  (Doc. No. 81 at 5.)

Despite the late request for leave to submit the supplemental evidence, the Court will grant Defendants' motion for leave.

## **DISCUSSION**

### **Diversity Jurisdiction**

#### General Principles and Forum-Defendant Rule

As Plaintiffs argue, the Eighth Circuit continues to apply the "anti-removal presumption" in run-of-the-mill diversity cases, even after *Dart Cherokee Basin*

*Operating Co. v. Owens*, 135 S. Ct. 547, 554 (Dec. 15, 2014), in which the Supreme

Court held that there is no "anti-removal presumption" in cases removed on the basis of

the Class Action Fairness Act. *See Hubbard,* 799 F.3d at 1227 (applying the presumption

without discussing *Dart*). Under the presumption, "any doubts about the propriety of

removal are resolved in favor of remand." *Id*. at 1227 (citation omitted); *see also Byrd v.*

*TVI, Inc.*, No. 4:15 CV 1439 CDP, 2015 WL 5568454, at *2 (E.D. Mo. Sept. 21, 2015)

(same). In addition, "the party invoking jurisdiction, bears the burden of proving that all

prerequisites to jurisdiction are satisfied." *Byrd*, 2015 WL 5568454, at *2.

As noted above, the removal statute provides that a case may not be removed on

diversity grounds "if any of the parties in interest properly joined and served as

defendants is a citizen of the State in which suit is brought." 28 U.S.C. § 1441(b)(2). A

violation of the forum defendant rule constitutes a jurisdictional defect in the Eighth

Circuit. *See Horton v. Conklin*, 431 F.3d 602, 604-05 (8th Cir. 2005) ("The violation of

the forum defendant rule is a jurisdictional defect and not a mere procedural irregularity

capable of being waived.").

The Court recognizes the split of authority among district courts, including courts

in this district, on whether a defendant can avoid the forum-defendant rule by removing a

case before a local defendant – or as here, any defendant – has been served. *Compare,*

*e.g*., *Hensley v. Forest Pharm., Inc*., 21 F. Supp. 3d 1030, 1036 (E.D. Mo. 2014) (holding

that strict adherence to the language of the statute would be inconsistent with the

fundamental purposes of removal and in contravention of the legislative intent behind the

forum-defendant rule), and *Prather v. Kindred Hosp*., No. 14-0828-CV-W-FJG, 2014

WL 7238089, at *4 (W.D. Mo. Dec. 17, 2014) (same), *with, e.g., Rogers v. Boeing Aerospace Operations, Inc.*, 13 F. Supp. 3d 972, 977 (E.D. Mo. 2014) (holding that the language of the statute must be followed; but recognizing, as an exception, the "egregious" case where a defendant "hawked" the state court docket and removed before any defendant had been served). The Court believes that the *Hensley* line of cases presents the better approach, especially today, in light of state court electronic filing systems, and will follow that line of authority. In any event, under *Rogers*, this case would qualify as an "egregious" one because it was removed six days after it was filed and before any Defendant had been served.[10]

Fraudulent Joinder Doctrine

An exception to the forum-defendant rule is that if the forum defendant was fraudulently joined, the case may be removed (assuming all other removal requirements are met, as they are here). In determining whether a defendant was fraudulently joined, the district court must decide "whether there is arguably a reasonable basis for predicting that the state law might impose liability based upon the facts involved." *Filla v. Norfolk S. Ry. Co.*, 336 F.3d 806, 811 (8th Cir. 2003). Put another way, the court must decide whether plaintiff might have a "colorable" claim against the forum defendant. *Junk v. Terminix Int'l Co.*, 628 F.3d 439, 446 (8th Cir. 2010). Thus, a defendant asserting fraudulent joinder must "prove that the plaintiff's claim against the diversity destroying defendant has no reasonable basis in fact and law." *Knudson v. Sys. Painters, Inc.*, 634

---

[10] The Court rejects out-of-hand Defendants' argument that the forum-defendant rule is not a good rule in the context of this case and so should not be followed.

F.3d 968, 977 (8th Cir. 2011) (citation omitted). In resolving a fraudulent joinder issue, a district court may consider materials outside the pleadings. *In re Genetically Modified Rice Litig*., 618 F. Supp. 2d 1047, 1052 (E.D. Mo. 2009) (collecting cases); *Petersen v. Rusch, Inc*., No. 4:05CV01328ERW, 2006 WL 83492, at *2 (E.D. Mo. Jan. 12, 2006). Furthermore, "the district court should resolve all facts and ambiguities in the current controlling substantive law in the plaintiff's favor." *Filla*, 336 F.3d at 811.

The Court first concludes that, resolving all facts and ambiguities in the current controlling substantive law in Plaintiffs' favor, there is "arguably a reasonable basis for predicting" that Missouri tort law might impose liability on Pharmacia (Old Monsanto) based on the facts alleged. *See Clair v. Monsanto Co*., 412 S.W.3d 295 (Mo. Ct. App. 2013) (holding that under California tort law, which is the same as Missouri law for relevant purposes, claims of strict liability and negligence arising from the manufacture of PCBs could go forward).

And so the question at this juncture is whether Plaintiffs have a colorable claim against either New Monsanto or Solutia based on Old Monsanto's manufacture of PCBs. The answer turns on whether either of these two entities assumed, rather than merely agreed to indemnify Pharmacia (Old Monsanto) for, Old Monsanto's PCBs' liabilities, and if so, whether Plaintiffs here may bring their claims against either forum Defendant. The crux of the matter centers on the interpretation of the various contracts and bankruptcy court documents noted above. The 1997 Distribution Agreement (as amended), the 2000 Separation Agreement (as amended), the 2007 Settlement Agreement, and the 2007 Pharmacia Indemnity Agreement all provide that they shall be

24

governed by Delaware law. "Confirmed bankruptcy plans of reorganization are binding

contracts that must be interpreted in accordance with applicable contract law." *In re*

*Sugarhouse Realty, Inc*., 192 B.R. 355, 362 (E.D. Pa. 1996).

> Delaware law adheres to an objective theory of contracts, under which a
> court will not consider extrinsic evidence to interpret the intent of the
> parties, to vary the terms of the contract or to create an ambiguity when the
> relevant contract terms are unambiguous. Contract terms are not
> ambiguous merely because the parties to the contract disagree on their
> meaning; rather, the Court stands in the shoes of an objectively reasonable
> third-party observer, and determines whether the contract language is
> unmistakably clear.

*Revolution Retail Sys., LLC v. Sentinel Techs., Inc*., No. CV 10605-VCP, 2015 WL

6611601, at *9 (Del. Ch. Oct. 30, 2015) (citations omitted).

"When the provisions in controversy are fairly susceptible of different

interpretations or may have two or more different meanings, there is ambiguity."

*Aleynikov v. Goldman Sachs Grp., Inc*., 765 F.3d 350, 362 (3d Cir. 2014) (applying

Delaware law) (holding that summary judgment could not be awarded because the

language of an agreement was ambiguous and the moving party failed to offer

uncontested evidence as to the proper interpretation); *see also GMG Capital Investments,*

*LLC v. Athenian Venture Partners I, L.P*., 36 A.3d 776, 783 (Del. 2012).

Here, the Court concludes that the relevant provisions of the agreements between

Pharmacia, Solutia, and New Monsanto are "fairly susceptible of different

interpretations" with respect to (1) whether the PCB liability assumed by Solutia in the

Distribution Agreement remains with Solutia, and (2) whether New Monsanto ever

assumed PCB liability, and if so, whether New Monsanto retains that liability.

With respect to Solutia, the Court concludes, as did the *Town of Lexington* court, that although the Distribution Agreement was superseded by the Settlement Agreement and the Reorganization Plan, Solutia retained the liability it assumed by virtue of the Distribution Agreement. This conclusion is based on the "Holders of Tort Claims" exclusion in the Reorganization Plan,[11] and the section in the Reorganization Plan on the treatment of "Tort Claims," notably the statement that "The Tort Claims shall be unaffected by the Chapter 11 Cases, this Plan or the Plan Documents [which included the Settlement Agreement]." Although these statements refer to "Tort Claims" and not "Legacy Tort Claims," there is at least an ambiguity as to whether "Tort Claims" includes "Legacy Tort Claims." Clearly the term "Tort Claims" is broader than "Legacy Tort claims," and without specifying the exclusion of Legacy Tort Claims, the term Tort Claims would naturally be understood to include Legacy Tort Claims.

With respect to New Monsanto, § 2.01 of the Separation Agreement, quoted above, is not a strict indemnification provision, but rather indicates an assumption of liability. In *SSM Health Care St. Louis v. Radiological Imaging Consultants, LLP*, 128 S.W. 3d 534 (Mo. Ct. App. 2003), the Missouri Court of Appeals explained the concept of indemnity as follows:

> Indemnity is a right that inures to the person who has discharged a duty that
> is owed by him, but which, as between himself and another, should have
> been discharged by the other, so that if the other does not reimburse the

---

[11]    As quoted above, this exclusion provided that "the Holders of Tort Claims shall not be deemed to release [Solutia] . . . on account of any liability arising from or related to the Tort Claims and . . . the Holders of Tort Claims . . . as a result of the [New] Monsanto Settlement Agreement, shall not be deemed to release [New] Monsanto or Pharmacia . . . on account of any liability from or related to the Tort Claims." (Doc. No. 34-11 at 139.)

person, the other is unjustly enriched to extent that his liability has been discharged.

*Id*. at 539. This is not the type of arrangement described in § 2.01. This conclusion would seem to be supported by the above-quoted statement in the July 1, 2002 amendment to the Distribution Agreement that pursuant to the Separation Agreement, New Monsanto "assumed certain liabilities related [to]" the chemical business assets Pharmacia had transferred to New Monsanto, followed by the statement, in the conjunctive, that New Monsanto assumed all liabilities that Solutia had assumed "to the extent that Solutia fails to pay." (Doc. No. 73-1 at 3.) The use of the conjunctive suggests that New Monsanto directly assumed PCB liabilities.

Other evidence that New Monsanto can be held directly liable for PCB claims is provided by the statements, described above, in Solutia's Reorganization Plan that "Holders of Tort Claims" were not releasing New Monsanto . . . on account of any liability arising from or related to the Tort Claims." (Doc. No. 34-11 at 139.) As in the case of Solutia, although these statements refer to "Tort Claims" and not "Legacy Tort Claims," there is at least an ambiguity as to whether "Tort Claims" includes "Legacy Tort Claims." Further, New Monsanto's 2015 Form 10-K, also described above, seems to suggest that New Monsanto viewed itself as more than just an indemnitor with respect to PCB claims such as Plaintiffs'.

Given these ambiguities, the Court cannot say, based on the record before it, that Plaintiffs do not have colorable claims against Solutia and/or New Monsanto (assuming that the theory of recovery itself is legally and factually sound). Thus, Plaintiffs' first

motion for remand is well taken.  *See Grady Bros. Investments, LLC v. Gen. Motors Acceptance Corp*., No. CIV.A.07-0747-WS-B, 2007 WL 4577701, at *6 (S.D. Ala. Dec. 27, 2007) (concluding that there was an ambiguity as to whether a warranty provision between the parties was intended to supersede other provisions, such that it would have been reasonable for the plaintiff to rely on representations of the non-diverse defendant concerning the environmental status of certain property; overruling the defendant's fraudulent joinder objection predicated on alleged lack of reliance, and remanding the case "because resolving such an ambiguity would be a step beyond" the jurisdictional inquiry).

Defendants' argument based on the no third-party beneficiaries provisions in the Distribution Agreement and the Separation Agreement is without merit.  Plaintiffs are not suing on claims created by either of those agreements.  Rather, their claims are based on the manufacture and sale of PCBs, and liabilities for conduct prior to any spin-offs.

Neither the interpretation of the various agreements involved to determine whether Solutia and/or New Monsanto are proper Defendants, nor the viability of the theory of recovery in this case, are matters of federal law.  The Court, thus, believes that the oft-stated principle applies here, that "where the sufficiency of the complaint against the non-diverse defendant is questionable, the better practice is for the federal court not to decide the doubtful question . . . but simply to remand the case and leave the question for the

state courts to decide."  *See Byrd v. TVI, Inc*., No. 4:15 CV 1439 CDP, 2015 WL

5568454, at *2 (E.D. Mo. Sept. 21, 2015) (citing numerous cases).[12]

**Federal Officer Removal**

Title 28 U.S.C. § 1442(a)(1) "grants independent jurisdictional grounds over cases

involving federal officers where a district court otherwise would not have jurisdiction."

*Jacks v. Meridian Res. Co*., 701 F.3d 1224, 1230 (8th Cir. 2012).  Section 1442(a)(1), in

relevant part, allows removal to a federal forum of any civil action against "any officer

(or any person acting under that officer) of the United States or of any agency thereof,

sued in an official or individual capacity for or relating to any act under color of such

office."  28 U.S.C. § 1442(a)(1).

In *Mesa v. California*, 489 U.S. 121 (1989), the Supreme Court traced the history

of § 1442(a), from its origin in 1814 as a congressional response to New England's

opposition to the War of 1812, through its expansion in the Civil War era as the need to

enforce unpopular federal revenue laws became acute.  *Mesa*, 489 U.S. at 125-26.  More

recently, the Supreme Court explained that the "basic" reason for allowing federal officer

removal, is because "State-court proceedings may reflect local prejudice against

unpopular federal laws or federal officials [and] States may deprive federal officials of a

---

[12]    The Court grants Plaintiffs' unopposed motion (Doc. No. 80) to supplement the record concerning removal on the basis of diversity jurisdiction with the deposition of Robert G. Kaley taken in the context of *Town of Lexington*.  Kaley, a designated representative of Defendants herein and in *Town of Lexington,* testified that it was his understanding that New Monsanto and Solutia "assumed" liabilities from Old Monsanto. The Court agrees with Defendants (and with the court in *Town of Lexington*) that this evidence is not relevant, as Kaley is not an attorney qualified to offer legal opinions, and further because his testimony does not answer the question of whether New Monsanto and Solutia assumed direct liability or indemnification responsibility.

federal forum in which to assert federal immunity defenses." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 150 (2007) (citations omitted). The words "or relating to" were added to the statute by Congress in 2011. This addition was "intended to broaden the universe of acts that enable Federal officers to remove to Federal court." *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 467 (3d Cir. 2015) (citing legislative history).

To come within the purview of § 1442(a)(1), Defendants must show that (1) they are "persons," within the meaning of the statute, (2) they acted under the direction of a federal officer, (3) there was a causal connection between their actions taken under federal direction and Plaintiffs' claims, and (4) they have a colorable federal defense to Plaintiffs' claims. *Jacks*, 701 F.3d at 1230; *Ruppel v. CBS Corp.*, 701 F. 3d 1176, 1180-81 (2012). As with diversity jurisdiction, the removing party bears the burden of proving the grounds supporting federal officer removal. *See, e.g., Ruppel*, at 1180.

It is undisputed that Defendants are persons within the meaning of the statute. With respect to the "acting under" requirement, the Supreme Court explained as follows in *Watson*: "Section 1442(a)(1)'s words 'acting under' are broad, and the statute must be liberally construed. But broad language is not limitless. And a liberal construction nonetheless can find limits in a text's language, context, history, and purposes." *Watson*, 551 U.S. at 147. In that case the Court rejected a cigarette manufacturer's argument that it acted under the federal government because it was subjected to heavy regulation. *Id.* at 152. Drawing on its previous federal officer removal cases, the Court held that "'acting under' must involve an effort to assist, or to help carry out, the federal superior's duties

or tasks." *Id.* "Cases in which the Supreme Court has approved removal involve defendants working hand-in-hand with the federal government to achieve a task that furthers an end of the federal government." *Ruppel*, 701 F.3d at 181. "'Acting under'" covers situations . . . where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete." *Id.*

The Court concludes that here, in light of the supplemental evidence submitted by Defendants, a somewhat close question is presented as to what extent Defendants have met the "acting under" requirement for federal officer removal. Upon review of the record before it, the Court concludes that this requirement is met only with respect to the PCBs that Old Monsanto sold directly to the government, or to others at the direction of the government. Although the government required the use of PCBs in certain products during the relevant time period, and provided financial assistance to Old Monsanto to manufacture them in the early 1940s, Defendants sold the PCBs, by and large, to government contractors and not to the government itself. Defendants have not maintained that the manufacturing process itself was in any way supervised or controlled by the government. *Cf. Anderson v. Hackett*, 646 F. Supp. 2d 1041, 1054 (S.D. Ill. 2009) (concluding that the Monsanto defendants in that case – Pharmacia, Solutia, Pfizer, and New Monsanto – were not entitled to federal officer removal of claims challenging their production and disposal of PCBs based on their argument that the government directed them to produce PCBs, as the evidence failed to show such direction).

This is in contrast to, for example, Agent Orange cases, in which courts have routinely held that the manufacturers of Agent Orange were entitled to federal officer

31

removal in cases asserting negligence and products liability claims, because the companies directly contracted with the government for the production of Agent Orange and the chemical was produced to the detailed specifications of the government. *See, e.g., Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137-38 (2nd Cir. 2008); *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398-99 (5th Cir. 1998).

The Court also concludes that Defendants have failed to meet the causal connection requirement for federal officer removal. The Court finds Plaintiffs' *de minimis* argument persuasive in the context of the rather novel theory of liability raised in this case. Plaintiffs' theory of liability is premised on their exposure to PCBs that over decades accumulated and persisted in the environment and food chain. Although the "calculus" is changed by the supplemental evidence, the record before the Court still shows that the amount of PCBs manufactured by Old Monsanto pursuant to direct contracts with the government, together with the amounts sold to federal contractors at the direction of the government, and even together with the amounts manufactured to meet the needs of defense contractors during the years of the Second World War, relative to the total amount of PCBs allegedly persisting in the environment and food chain, is simply too small to satisfy the requirement that there be a causal connection between the conduct that was taken under federal authority and Plaintiffs' claims. This dictates against finding federal officer removal.

The Court need not decide whether Defendants' asserted preemption defenses constitute colorable federal defenses in this case.

## CONCLUSION

The Court concludes that Defendants have failed to meet their burden of showing that removal of this action was proper.

Accordingly,

**IT IS HEREBY ORDERED** that the parties' motions for leave to supplement the record are **GRANTED**. (Doc. Nos. 75 & 80)

**IT IS FURTHER ORDERED** that Plaintiffs' motion to remand this case to state court due to lack of diversity jurisdiction is **GRANTED**. (Doc. No. 24.)

**IT IS FURTHER ORDERED** that Plaintiffs' motion to remand this case to state court due to lack of federal officer jurisdiction is **GRANTED**. (Doc. No. 39.)

**IT IS FURTHER ORDERED** that the Clerk of Court shall take all necessary steps to remand this case to the state court in which it was filed.

AUDREY G. FLEISSIG
UNITED STATES DISTRCIT JUDGE

Dated this 31st day of March, 2016